## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DALE BROWN & | : | |
| ROXANNE BROWN, individually and | : | CIVIL ACTION NO: |
| as H/W | : | |
| | : | 07-02776 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| NEW HANOVER TOWNSHIP | : | |
| POLICE DEPARTMENT, NEW | : | |
| HANOVER TOWNSHIP, MICHAEL | : | |
| DYKIE, ANTHONY CALVANESE, | : | |
| DENNIS PSOTA, and JOHN DOES 1-10, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM: RE CROSS-MOTIONS FOR SUMMARY JUDGMENT

***Baylson, J.***                                                   *September 19, 2008*

Presently before this Court are parties' Cross-Motions for Summary Judgment pursuant to

F. R. Civ. P. 56.  Plaintiffs have filed suit under 42 U.S.C. § 1983 and Pennsylvania state law,

alleging various violations of their Constitutional and state law rights.  Viewing the evidence in

the light most favorable to the non-moving party, the Court finds that Plaintiffs have failed to

produce sufficient facts to warrant trial, and will thus grant Defendants' motion and deny

Plaintiffs' motion.

**I.      Background**

  **A.      Facts**

Plaintiffs have alleged multiple constitutional and state law claims against the above

name Defendants.  The majority of claims arise from an altercation at the Plaintiffs' home on

-1-

July 4th, 2005.   During that holiday, Officers Calvanese and Psota, and one other officer, first arrived at the home of Plaintiffs Dale and Roxanne Brown (hereinafter referred to as "Dale" or Roxanne") at approximately 10:00 PM after Dale had shot off a cannon he owned.  (Dale Brown Dep. Pg. 119).  According to Dale, the Officers told him said they were responding to the loud noise produced by the cannon, which they claimed to have heard while up the street at a neighbor's house.  While the Officers told the Plaintiffs they were responding to complaints by the neighbors, there is no official record of any complaints.  Dale admitted to seeing the Officers' cars parked up the street prior to their arrival and agreed that the cannon was exceptionally loud. (Dale Brown Dep. Pgs. 124, 138).  The Plaintiffs and the officers spoke amicably for several minutes, even "laughing and joking," before the officers left, instructing Plaintiffs that they did not want to hear the cannon again.  (Dale Brown Dep. Pg. 122).

Dale testified that the Officers returned again around 1:00 AM, in the early morning of July 5th, 2005.  Shortly before that time, Dale again shot off the cannon, and Officer Psota again responded to the scene, informing Plaintiff that people were similarly complaining of the noise and he should not set it off so late.  (Dale Brown Dep. Pgs. 137, 142-45).  In his deposition, Dale questioned whether such complaints had actually been made, noting he had set off the cannon for years without any complaint by his neighbors or the police and that one neighbor who had been sleeping had not even woken up from the noise.  (Dale Brown Dep. Pg. 145).

As Dale spoke with Officer Psota, Officer Calvanese arrived at the scene, along with about ten to fifteen of the Browns' neighbors, including Mark DeLuzio.  (Dale Brown Dep. Pgs. 155-156).  Plaintiffs' Brief describe the scene as follows:

Prior to the neighbors approaching Plaintiffs' property, Defendants huddled with the

> neighbors, stirring emotions.  Defendant, Calvanese, talked with the group.  As they
> planned, Defendants then stood back and watched the mob slowly approach the Brown
> property.  Co-defendants did nothing to discourage the neighbors. . . . Defendant,
> Calvanese, watched [the ensuing fight] with his arms crossed and a smirk on his face,
> then leading the charge to invade the Plaintiffs' homestead.

(Memorandum of Law in Support of Pl.'s Response to Def.'s Motion for Summary Judgment

Pgs. 2-3).  While this description sounds ominous and certainly supports Plaintiffs' allegations

that their civil rights were violated, Dale's own deposition testimony does not support this

version of the facts.  Plaintiffs correctly cite to Dale's deposition for the fact that Officer

Calvanese was talking to the group of neighbors before he walked over to the Plaintiffs property.

(Dale Brown Dep. Pgs. 138-139).  However, there is no testimony that he "planned" or otherwise

collaborated with the neighbors in any way to plan the mob's approach, as Plaintiffs suggest.

Dale only testified that Calvanese and the neighbors arrived at the same time after talking.  (Dale

Brown Dep. Pgs. 154-155).  Similarly, Plaintiffs' suggestion that Calvanese "stirred emotions" is

mere conjecture, without support in the record.  In fact, Plaintiff testified that he did not hear any

conversation between Officer Calvanese and the neighbors prior to their arrival.  (Dale Brown

Dep. Pg. 159).  Plaintiff did testify that Officer Calvanese stood smiling in a corner, with his

arms crossed, watching the altercation between Plaintiffs and the other neighbors, but there is no

testimony supporting the accusation that Calvense "lead the charge to invade."

According to Dale, Officer Calvanese watched as DeLuzio began screaming at Plaintiff,

accusing him of threatening DeLuzio's son earlier in the day.  (Dale Brown Dep. Pgs. 155, 164-

165).  Plaintiff denies making such threats, as he was at a 4th of July party all day.  (Dale Brown

Dep. Pgs. 155, 165).  As the tension escalated, Roxanne yelled back at DeLuzio and then spat on

him, at which point he slapped her in the face.  (Dale Brown Dep. Pg. 168).  Plaintiffs' son,

Mike, then engaged in a fight with one of the neighbors, which Dale believes Officer Psota tried to break up. (Dale Brown Dep. Pg. 169). Dale was also tackled by someone and his daughter was thrown against a tree. (Dale Brown Dep. Pgs. 174-76). Plaintiff describes the events as "the craziest three minutes of my life" and "it all happened so fast." (Dale Brown Dep. Pgs. 170, 174).

Eventually, additional police arrived until a total of fourteen officers were present at the scene. (Dale Brown Dep. Pgs. 177, 185). Plaintiffs' son, DeLuzio, and one other individual were arrested by the police, though no charges were pursued against Plaintiffs' son. (Dale Brown Dep. Pgs. 178; Def.'s Response to Pl.'s Contra-Statement of Facts Pg. 1). Plaintiffs and Defendants agree that neither Plaintiff was struck by any police officer during the scuffle, and neither Plaintiff received any medical or psychological treatment for their injuries. (Def.'s Statement of Undisputed Facts ¶s 31-34; Pl.'s Response to Def.'s Statement of Undisputed Facts ¶s 31-34).

As the police arrived, Dale called his friend, Officer Jones, to describe the situation. While Plaintiff was on the phone with Jones, Officer Calvanese approached him and challenged him to a fight. (Dale Brown Dep. Pg. 187). According to Plaintiff, the other cops were surprised at Officer Calvanese's behavior and eventually Chief Dykie, who was present, persuaded Officer Calvanese to calm down. (Dale Brown Dep. Pg. 188). Defendant admits that Officer Calvanese was later suspended without pay for one day for challenging Mr. Brown. (Def.'s Response to Pl.'s Contra-Statement of the Facts Pg. 2). After this interaction, the police finished their business and eventually left the property. (Dale Brown Dep. Pg. 188).

Both parties agree that following the incident, Plaintiffs submitted written complaints to New Hanover Township. (Def.'s Response to Pl.'s Contra-Statement of the Facts Pg. 2).

Plaintiffs assert that they were prohibited from speaking regarding the incident at a town meeting, but Defendants dispute this fact, pointing out that Dale admitted he was allowed to speak at the meeting and was instructed at the meeting on how to file a proper complaint.  (Dale Brown Dep. Pgs. 199-200).  Plaintiffs state that Chief Dykie has not responded to their complaints and has instead "blamed, threatened, and belittled" them, though Plaintiff has not described any specific incidents of such behavior. (Memorandum of Law in Support of Pl.'s Response to Def.'s Motion for Summary Judgment Pg. 3).

Plaintiffs further contend that the New Hanover police have continued to harass them since the July 4th, 2005 incident.  For example, Plaintiffs state that officers sat with their high beams pointed on Defendants' property for extended periods.  (Memorandum of Law in Support of Pl.'s Response to Def.'s Motion for Summary Judgment Pg. 3).  Defendants admit that Dale Brown testified to a single such incident lasting one half hour but argue that the event was never reported.  (Dale Brown Dep. Pgs. 247-248; Def.'s Response to Pl.'s Contra-Statement of Facts at 2).  Plaintiffs also assert that the Defendants harassed them when Officer Diaz followed Dale home, threatened him with a taser gun, and broke down his door.  (Memorandum of Law in Support of Pl.'s Response to Def.'s Motion for Summary Judgment Pg. 3).  Defendants admit that Officer Diaz attempted to pull Dale over while he was driving for failure to have a valid drivers license, that Dale did not comply, and that Officer Diaz followed Dale home and kicked in a portion of his door when he did not comply with the officer's commands and resisted arrest. With regard to that incident, Dale was charged with obstructing justice, driving on a suspended license, resisting arrest, and disorderly conduct, and he pled guilty to one or two of those charges. (Def.'s Response to Pl.'s Contra-Statement of Facts Pg. 3).  Thus, Defendants suggest that the

facts do not support Plaintiffs' argument that Officer Diaz harassed Dale Brown during the

incident in question. Finally, Plaintiffs state that Defendant Calvanese followed Plaintiff Dale

Brown and his daughter Alyssa into a store. (Roxanne Brown Dep. Pg. 76). Defendants deny

that Officer Calvanese purposefully followed Plaintiff or his daughter and therefore harassed

Plaintiff or his daughter. (Def.'s Response to Pl.'s Contra Statement of Facts Pg. 3).

Notably, the July 4th, 2005 incident was not the first interaction between the Plaintiffs and

the New Hanover Police, and Officer Calvanese in particular. In 2004, a four-wheeler was stolen

from the Plaintiffs' property, and Plaintiffs did not feel that the Police Department pursued the

investigation of the theft diligently. (Dale Brown Dep. Pg. 82). Specifically, Dale had given

Officer Calvanese the name of an individual who had admitted to the theft, but Officer Calvanese

refused to arrest the man or otherwise investigate him. (Dale Brown Dep. Pgs. 78-79). Plaintiff

testified that he thought Officer Calvanese believed at one point that Plaintiff had set up the theft

for insurance fraud purposes. (Dale Brown Dep. Pg. 93). In 2005, prior to the July 4th incident,

Plaintiff and Officer Calvanese also had an unpleasant but non-violent interaction at the local

WaWa. (Dale Brown Dep. Pgs. 100-105). Furthermore, Plaintiff had noticed that Officer

Calvanese had been sitting next to his house at 11:00 PM in 2004, for no apparent reason. (Dale

Brown Dep. Pg. 204). Dale testified that he and Officer Calvenese do not like each other. (Dale

Brown Dep. Pg. 92). Plaintiffs also had several problems with their dog being loose in 2005, and

were cited for mishandling their dog, though Dale does not believe the police dealt with this

situation improperly. (Dale Brown Dep. Pgs. 108-112).

In sum, taken in the light most favorable to the Plaintiffs, the evidence does not

demonstrate that either Plaintiff was arrested, physically assaulted, or otherwise deprived of their

liberty by the New Hanover Police during or in connection with the July 4, 2005 incident.

### B.     Plaintiffs' Claims

Plaintiffs have brought several constitutional and state law claims against the individual officers and the township.  They first allege that Officers Psota and Calvanese, Chief Dykie, and ten other unnamed officers violated their First, Fourth, and Fourteenth Amendment rights. Plaintiffs also allege that the township should be held liable for harassment by the officers under the theory of <u>Monell</u>, as should Chief Dykie, under a similar supervisory theory.  Plaintiffs also bring a series of state law claims against the officers in their individual capacity, including assault and battery, conspiracy, and aiding and abetting.[1]  Finally, Plaintiffs bring a claim for punitive damages against the individual defendants, alleging "bad motives" and "wanton, willful and reckless disregard for the rights of Plaintiffs." (Complaint at 6).[2]

## II.    Legal Standards

### A.      Jurisdiction

This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction of Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

### B.     Standard of Review

The standards by which a court decides a summary judgment motion do not change when

---

[1]Plaintiffs initially included a claim for intentional infliction of emotional distress as well but withdrew that claim in their Memorandum of Law in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment and Cross-Motion for Partial Summary Judgment.

[2]In their Memorandum of Law in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment and Cross-Motion for Partial Summary Judgment, Plaintiffs appear to "concede" their claim for punitive damages against New Hanover Township.  However, the Township was not listed as a defendant in the punitive damages count of the original complaint.

the parties file cross-motions.  Southeastern Pa. Transit Auth. v. Pennsylvania Pub. Util.

Comm'n, 826 F. Supp. 1506, 1512 (E.D. Pa. 1993).  Summary judgment is appropriate "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  An issue is "genuine" if

the evidence is such that a reasonable jury could return a verdict for the non-moving party.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A

factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

      A party seeking summary judgment always bears the initial responsibility for informing

the district court of the basis for its motion and identifying those portions of the record that it

believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett,

477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular

issue at trial, the moving party's initial burden can be met simply by "pointing out to the district

court that there is an absence of evidence to support the non-moving party's case."  Id. at 325.

After the moving party has met its initial burden, "the adverse party's response, by affidavits or

as otherwise provided in this rule, must set forth specific facts showing that there is a genuine

issue for trial."  FED. R. CIV. P. 56(e).  Summary judgment is appropriate if the non-moving party

fails to rebut by making a factual showing "sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial."

Celotex, 477 U.S. at 322.  Under Rule 56, the Court must view the evidence presented on the

motion in the light most favorable to the opposing party.  Anderson, 477 U.S. at 255.

### III.     Discussion

#### A.     Requests for Additional Discovery and Unnamed Defendants

The docket and pleadings in this case show that the court had a Rule 16 pretrial conference with counsel on December 4, 2007, following which a scheduling order was filed on December 6, 2007, setting a discovery deadline of April 30, 2008.   On January 9, 2008, Defendants filed a motion to compel discovery, (Doc. No. 10), asserting that Plaintiffs had failed to appropriately respond to written discovery, and following a telephone conference, the Defendants' motion to compel was denied as moot.  (Doc. No. 14).

According to the pleadings, the Plaintiffs never noticed depositions of any of the defendants, or of anyone else, and never took any action to identify the ten Defendants named as "John Doe" in the caption of the complaint.  Plaintiffs now request the Court order additional depositions to identify additional defendants but the named Defendants argue that the claims against the unnamed Defendants should be dismissed, claiming prejudice and undue delay. (Def.'s Memorandum of Law in Support of Pl.'s in Support of their Motion for Summary Judgment Pg. 3).  While Plaintiffs reply that they could not independently discover the identity of the other defendants previously and the Defendants did not submit to depositions, (Memorandum of Law in Support of Pl.'s Response to Def.'s Motion for Summary Judgment Pg. 13), it was not until the Defendants had moved for summary judgment on May 6th, 2008, that Plaintiffs actually filed a motion to compel depositions of Defendants. (Doc. No. 18).  The Defendants responded to that motion on the grounds that Plaintiffs had never properly sought the Defendants' depositions during the discovery period and that it was prejudicial to allow those depositions to take place after the defendants had stated their grounds for summary judgment, in accordance

with the pretrial schedule set by the court.  (Doc. No. 19).

After a telephone conference on May 16, 2008 with counsel concerning Plaintiffs' motion to compel, the court denied the motion to compel without prejudice. (Doc. No. 21).  The pleadings reveal that the parties agreed the court would adjudicate the Defendants' motion for summary judgment, and, if the motion was denied, the court would then revisit the Plaintiffs' motion to compel and determine whether to allow depositions of defendants prior to trial. Plaintiffs' own pleading (Docket No. 27) shows that the Plaintiffs did not pursue their desire to take the Defendants' depositions prior to the court's determination of summary judgment.  This was not an irrational strategy, because the court would view the facts presented by the Plaintiffs in the light most favorable to Plaintiffs in adjudicating Defendants' summary judgment motion. Plaintiffs' counsel was obviously of the view that the Defendants' depositions would not advance the Plaintiffs' version of the events in our consideration of summary judgment.

Given the above  history, specifically the pleadings regarding the motion to compel deposition of the Defendants, the Court is unwilling to grant Plaintiffs' request.  The Court finds that the Plaintiffs' Rule 56(f) "Affidavit" requesting discovery (which is merely signed by counsel but not taken subject to the penalty against perjury, but which will be nonetheless considered as comporting with the requirements of Rule 56(f)), is inconsistent with the position that the Plaintiffs had previously took, and the court does not find good grounds to allow further discovery at this time.

As such, the Court must now address the issue of the remaining unnamed John Doe defendants. "Fictitious parties may be used 'at least until reasonable discovery permits the actual defendants to assume their places.'" Atlantic Used Auto Parts v. City of Philadelphia, 957 F.

Supp. 622, 625 (E.D. Pa. 1997) (quoting <u>Klinger v. Yamaha Motor Corp. USA</u>, 738 F. Supp.

898, 910 (E.D. Pa. 1990)).  However, such parties must be dismissed if discovery does not yield

their identities.  <u>Sheetz v. Morning Call, Inc.</u>, 130 F.R.D. 34, 37 (E.D. Pa. 1990).  Thus in

<u>Atlantic Used Auto Parts</u>, Judge Joyner dismissed the unnamed John Doe defendants when

discovery had closed months earlier and the plaintiffs had made no effort to amend the complaint

or serve additional defendants.  957 F. Supp. at 625.

In this case, Plaintiffs were given ample opportunity during discovery, which concluded

over four months ago, to identify the unknown officers who were present at the Plaintiffs' home

during the July 4th, 2005 incident.  Specifically, Plaintiffs failed to request or notice any

depositions of Defendants prior to the close of discovery and prior to Defendant's filing a

dispositive motion.  Plaintiffs' request for additional discovery has been denied, and they have

not otherwise indicated that they know or will soon learn the identity of the individuals and will

amend the complaint to name them specifically.

It is worth noting that even if Plaintiffs learned the identity of the unnamed Defendants in

the future, allowing Plaintiffs to add new defendants to the litigation would likely be unfair to all

Defendants.  Such additions would likely raise new facts and likely require additional discovery.

<u>The Development Group, LLC v. Franklin Twp. Bd. of Sup'rs</u>, 2004 WL 1773720, * 3 (E.D. Pa.

August 5, 2004) (discussing how the addition of new defendants poses questions of fairness by

raising new facts and requiring more discovery).  Moreover, allowing amendments once

dispositive motions have been filed, can prejudice the other party.  <u>Id.</u>  <u>See also Anderson v. City</u>

<u>of Philadelphia</u>, 65 Fed. Appx. 800, 801-803 (3d Cir. 2003) (refusing to allow substitution of

named individual for Doe Defendants because those named individuals lacked notice of the suit

against them and would therefore be prejudiced).

Regardless of whether the Court would have permitted the amendment, as the Plaintiffs have made no attempts to identify the unnamed Defendants or amend the complaint since the close of discovery, the Defendants' Motion for Summary Judgment on the claims against the unnamed Defendants will be granted.

### B.     Individual Defendants: Qualified Immunity

As an initial matter, the individual Defendants assert that they are entitled to qualified immunity on Plaintiffs' First, Fourth, and Fourteenth Amendment claims.  "Qualified immunity is an 'entitlement not to stand trial or face the other burdens of litigation.'  The privilege is 'an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'"  Saucier v. Katz, 533 U.S. 194, 200-201 (2001) (internal quotations omitted).

Where a defendant asserts a qualified immunity defense in a motion for summary judgment, plaintiff bears the initial burden of showing that the defendant's conduct "violated some clearly established statutory or constitutional right."  Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997).   Once plaintiff meets that initial burden, defendant must "demonstrate that no genuine issue of material fact remains as to the 'objective reasonableness' of the defendant's belief in the lawfulness of his actions." Id.  If a police officer could have believed his conduct was lawful in light of clearly established law and the information he possessed at the time he acted, he is entitled to qualified immunity.  Karnes v. Skrutski, 62 F.32 485, 491 (3d Cir. 1995).

Thus, the first inquiry is whether the Plaintiffs have met the initial burden of showing that the Defendants' conduct violated clearly established law.  Plaintiffs allege violations of their

First, Fourth, and Fourteenth Amendment rights and we will consider each in turn.

### 1.    First Amendment Claims

First, Plaintiffs contend that the Defendants violated their First Amendment rights by "block[ing]" their attempts to file complaints and then retaliating against plaintiffs for filing those complaints in violation of their right to petition to the government.  (Memorandum of Law in Support of Pl.'s Response to Def.'s Motion for Summary Judgment Pg. 8).   Plaintiffs have failed, however, to present sufficient facts on summary judgment demonstrating that Defendants violated clearly established law regarding their First Amendment rights.  Thus, the individual Defendants are entitled to immunity on Plaintiffs' First Amendment claim.

### a.    Right to Petition Claim

The Supreme Court has noted that the right to petition the government is one of "the most precious of the liberties safeguarded in the Bill of Rights" and is essential to " the very idea of a government, republican in form." BE&K Const. Co. v. N.L.R.B., 536 U.S. 516, 524-25 (2002). "The First Amendment's petition clause imposes on the United States the obligation to have at least some channel for those who seek redress for perceived grievances," and through the Fourteenth Amendment, imposes the same obligation on the states.  San Filippo v. Bongiovanni, 30 F.3d 424, 442 (3d Cir. 1994).  The Third Circuit has described various types of formal and informal methods of petitioning, which range from filing lawsuits and workers compensation claims to letters and personal complaints, and each method deserves a varying degree of constitutional protection.  Foraker v. Chaffinch, 501 F.3d 231, 236-37 (3d Cir. 2007).  Still, the right to petition, like the related freedom of speech, is not absolute, and though described in unqualified language in the First Amendment, the scope of the right depends on the context in

which it is exercised.  San Filippo, 30 F.3d at 435, 438.

According to Dale's testimony, he attended a town hall meeting with the intention of airing his grievances about the way the police handled the situation at his home on July 4th, 2005. At the meeting, he was permitted to speak for a few minutes and then was asked by a board member to file a proper complaint with the township.  The board member instructed Dale on the proper filing procedure, which he then followed.  (Dale Brown Dep. Pgs. 199-200).  Plaintiff characterizes his treatment at the meeting as "blocking" his right to petition the township. (Memorandum of Law in Support of Pl.'s Response to Def.'s Motion for Summary Judgment Pg. 8).

Plaintiff has not presented specific facts that any of the named individual Defendants were responsible for "blocking" his petition at the town meeting and thus could be liable for directly restricting his right to petition.   However, even taking the facts in the light most favorable to the Plaintiff, no reasonable jury could find that the Plaintiffs' right to petition was in fact clearly restricted or otherwise violated by any official of New Hanover, either at the meeting or thereafter.  Plaintiff was allowed to speak at the meeting and then was directed on how to properly file a complaint, which he did.  Notably, the First Amendment is not violated when speech at township meetings are limited to issues directly germane to town governance, especially when such speech becomes repetitive or disruptive.  Eichenlaub v. Township of Indiana, 385 F.3d 274, 281 (3d Cir. 2004).  See also City of Madison Joint Sch. Dist. V. Wis. Emp. Relations Comm'n, 429 U.S. 167, 175 n. 8 (1976) ("Plainly public bodies may confine their meetings to specified subject matter.").  Given that his right to petition is not absolute in the first instance and that he was not deprived of his ability to exercise it, no reasonable jury could

find that the Defendants' clearly violated Dale's rights.  Furthermore, Plaintiffs failed to provide

any evidence that the township did not consider his complaints after they were filed.  Thus,

Plaintiffs have not met their burden of showing a violation of clearly established law, and

Defendants are entitled to qualified immunity on this claim.

**b.      Retaliation Claim**

Besides a claim of direct infringement of his constitutional right, an individual may also

have a viable claim against the government when he can prove that the government took action

against him in retaliation for exercising his First Amendment rights.  Mt. Healthy City Sch. Dist.

Bd. of Educ. v. Doyle, 429 U.S. 274, 283 (1977).  To show that Defendants violated their First

Amendment rights under a retaliation theory, Plaintiffs must prove (1) that they engaged in

constitutionally protected activity; (2) that the government responded with retaliation; and (3)

that the protected activity caused the retaliation.  Eichenlaub, 385 F.3d at 282.  Plaintiffs

undisputedly engaged in constitutionally protected activity under the first prong when they

complained about their treatment by the township police department.  See id. at 284 (holding that

the First Amendment protects speech objecting to individualized mistreatment in private matters

outside of the public employment context).   The question remains whether the state actors

responded with retaliation as a result of that protected activity.

Plaintiffs must show that they suffered some sort of adverse reaction by the government

officials to meet the second prong.  Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001).  In

Anderson v. Davila, 125 F.3d 148, 163 (3d. Cir. 1997), the Third Circuit held that harassment, by

way of unnecessary surveillance, in response to a plaintiff filing a potentially vexatious lawsuit

against his former employer, a Police Department, amounted to retaliation.  Because the plaintiff

-15-

was denied the benefit of initiating litigation– a form of petitioning– without the uncalled-for

surveillance, his First Amendment rights had been burdened for purposes of a retaliation claim

and he had satisfied the second prong.  Id. Once such adverse action has been shown, plaintiffs

then must establish causation.  The Third Circuit applies a burden-shifting framework: a plaintiff

has the initial burden of showing that the protected activity was a substantial or motivating factor

for the defendant's retaliatory conduct, then the defendant must show by a preponderance of the

evidence that it would have taken the same action in the absence of the protected activity.

Rauser, 241 F.3d at 333.  Importantly, at the summary judgment stage, the court views all

evidence and all justifiable inferences to be drawn in the light most favorable to the nonmoving

party.  Id. at 334.

The Plaintiffs have not suggested that Defendant Psota engaged in any instances of

harassment against the Plaintiffs after Plaintiffs lodged their complaints; all of the retaliatory

conduct Plaintiffs complained of was performed by other officers.  Thus, Plaintiffs have not

shown that Defendant Psota violated their clearly established First Amendment rights by

retaliating against them in any way, and thus Defendant Psota is entitled to qualified immunity.

Plaintiffs do suggest that Defendants Dykie and Calvanese engaged in harassing conduct

during or after they filed their complaints.  With regards to Defendant Dykie, Plaintiffs only

suggested that Chief Dykie "blam[ed] and belittl[ed]" them.  Dale testified that Chief Dykie

treated them like "morons" when they met with him to discuss the matter and that he was

dissatisfied with how Chief Dykie failed to address the matter, (Dale Brown Deposition Pgs. 215,

232), but he provided no other facts to support a charge of persistent harassment.  Finally,

Plaintiffs argue that Defendant Calvanese engaged in harassing conduct meant to be retaliatory

-16-

after Plaintiffs lodged their complaint by following Plaintiff Dale Brown and his daughter into a store.

Even assuming that Dykie's comments and Calvanese' single incident amount to sufficient harassment to be characterized as "adverse" or "retaliatory" conduct, Plaintiffs have failed to provide any facts demonstrating causation.  Plaintiffs have the initial burden of proving that their protected activity was a motivating or substantial factor in Defendants conduct, but they have offered no factual support for this proposition.  In Rauser, the court found sufficient evidence of causation, noting that the plaintiff "presented a great deal of evidence from which a reasonable jury could conclude that the prison officials penalized him because he insisted on exercising his First Amendment rights," including a warning not to interrupt the prison's alcohol programs with constitutional challenges.  241 F.3d at 334.  In contrast, Plaintiffs here have offered absolutely no facts from which a jury could conclude that Defendants Dykie or Calvanese acted because the Plaintiffs were complaining; there is a complete dearth of evidence in the record providing any causal link between their actions and the fact that the Plaintiffs had filed their complaint..  Thus, as Plaintiffs have failed to meet their burden of proof regarding causation, they cannot demonstrate that their First Amendment rights have been clearly violated by Defendants Dykie or Calvanese under a retaliation theory.

Furthermore, while Plaintiffs contend that "an officer" sat with their high beams on in front of Plaintiffs' property in retaliation to their complaint, they have not alleged that any of the named Defendants were responsible for that incident.  Plaintiffs also describe a possibly retaliatory incident involving Officer Diaz, but he is not a named Defendant in this litigation.  Thus, as Plaintiffs have failed to show that any of the named Defendants engaged in retaliatory

conduct specifically motivated by or causally connected to their complaint, there are insufficient facts to show that any Defendant clearly violated Plaintiffs' First Amendment rights under a retaliation theory. Thus all individual Defendants are entitled to qualified immunity on this claim.

### 2.     Fourth Amendment Claim

Plaintiffs also argue that Defendants violated their Fourth Amendment right to be free from unreasonable search and seizures. However, Plaintiffs again fail to prove that Defendants' conduct violated clearly established law. Thus, Defendants are likewise entitled to qualified immunity on the Fourth Amendment claim.

Plaintiffs contend that they were improperly seized on their property when the police "used the presence of the neighbors to gain physical control of Plaintiffs" and that they were restrained from leaving their property. (Memorandum of Law in Support of Pl.'s Response to Def.'s Motion for Summary Judgment Pg. 7). A seizure does not occur simply because an officer approaches an individual and asks a few questions, as long as a reasonable person would feel free to disregard and go about his business. Florida v. Bostick, 501 U.S. 429 (1991). Rather, a person is seized under the Fourth Amendment only if he is detained by means intentionally applied to terminate his freedom of movement. Berg v. County of Allegheny, 219 F.3d 261, 269 (3d Cir. 2000). An individual is seized only when his or her general freedom of movement is restrained by physical force or a show of authority to the extent that a reasonable person "Would have believed he [or she] was not free to leave." Beckerman v. Susquehanna Tp. Police and Admin. 254 Fed. Appx. 149, 153 (3d Cir. 2007) (citing U.S. v. Mendenhall, 446 U.S. 544, 553-54 (1980)).

Plaintiffs have not suggested that their freedom of movement was in any way restrained during the Officers' first visit to investigate the cannon or when Officer Psota first arrived to ask again about the cannon at 1:00 AM.  Thus, no reasonable jury could conclude on the facts alleged that they were seized at those times for purposes of the Fourth Amendment.  On the other hand, Plaintiffs have described that once the violence broke out with the neighbors during the officers' second visit and additional police arrived (up to fourteen officers), Plaintiffs were restrained from leaving their property by the presence of both their threatening neighbors and the large number of police.  (Memorandum of Law in Support of Pl.'s Response to Def.'s Motion for Summary Judgment Pg. 7).  Specifically, Dale asserts that he was told to stay on his property while the officers arrested certain individuals, (Dale Brown Dep. Pgs. 178, 181-82), although he "did not blame [the officers]" for requesting that he did not interfere.  (Dale Brown Dep. Pg. 178, 182). Given these circumstances, a jury could arguably conclude that a reasonable person would have felt he or she was not free to leave as a result of the police presence and show of authority.

However, to amount to a violation of the Fourth Amendment and a viable § 1983 claim, the seizure must also be unreasonable.  Brower v. County of Inyo, 489 U.S. 593, 599 (1989).   In assessing the reasonableness of a seizure, the court balances the nature of the intrusion with the government's interest at stake.  Graham v. O'Connor, 490 U.S. 386, 396 (1989).   The court examines reasonableness from the perspective of a reasonable officer on the scene and must take into account the fact that officer are required to make split second decisions in tense and rapidly-evolving situations.  Id.   The inquiry is concerned with the objective reasonableness of the actor's conduct and not his underlying intent or motivations.  Id.

Given these standards, Plaintiffs have not presented any facts suggesting the Officers'

handling of the violent outbreak at Plaintiffs' home was unreasonable.  At that point criminal

activity had occurred on the premises, and it was not objectively unreasonable for the police to

detain those involved for an investigation and for their own safety.  Plaintiffs have not described

any excessive use of force, or any use of force by the Officers at all, and neither Plaintiff was

arrested or physically contacted.  No reasonable juror could conclude that merely instructing

Plaintiffs to remain on their property while the police dealt with the arrestees and disbanded the

rest of the clearly agitated group is objectively unreasonable.  Thus, Plaintiffs have failed to show

that Defendants violated their clearly established Fourth Amendment rights, and thus Defendants

are entitled to qualified immunity on the Fourth Amendment claims.

### 3.    Fourteenth Amendment Claim

#### a.    State-Created Danger Doctrine

Plaintiffs argue that the individual Defendants should be held liable for violating the

Plaintiffs' Fourteenth Amendment rights under the state-created danger doctrine.  However,

Plaintiffs fail to meet their burden of showing that Defendants violated their rights under that

theory and therefore the Defendants are entitled to qualified immunity.

The state-created danger doctrine is clearly established in this circuit.  Liability under the

theory requires (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state

actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship

between the state actor and the plaintiff; and; (4) the state actors used their authority to create an

opportunity that otherwise would not have existed for the third party's crime to occur.  <u>Kneipp v.

Tedder</u>, 95 F.3d 1199, 1208 (3d Cir. 1996).  Importantly, the cases where this theory applies are

"'based on discrete, grossly reckless acts committed by the state or state actors, using their

peculiar positions as state actors leaving a discrete plaintiff vulnerable to a foreseeable injury.'" Id. (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1153 (3d Cir. 1995)).  Emphasizing causation, the court in Mark, concluded that liability was appropriate because "it would be unfair to say that the state actor was not responsible for" the harm suffered by plaintiff. 51 F.3d at 1153.

In Kneipp, the plaintiffs brought a complaint against a city and its police officers, alleging that the officers caused the plaintiff harm when they detained her but allowed her escort to leave because, as a result, she was forced to walk home alone in an intoxicated state and fell down an embankment, suffering brain damage.  The court concluded that the plaintiff had a viable claim under the state-created danger theory.  First, a reasonable jury could find that the injury suffered by the plaintiff in her intoxicated state and left unescorted was indeed foreseeable.  Id. at 1208. The court also found that a material issue existed over whether the officers acted in willful disregard of the plaintiffs safety and that a reasonable jury could find the officer exerted sufficient control over the plaintiff to establish the requisite relationship.  Id. at 1209.  Finally, the court held that a reasonable jury could also believe that the police made the plaintiff more vulnerable than she otherwise would have been.  Id.

Plaintiffs in the present case refer to Bumpess v. Philadelphia Housing Authority, 1999 WL 239070 (E.D. Pa. April 13 1999), in which Magistrate Judge Angell, denied summary judgment, finding sufficient issues of fact.  Id. at *2.  The plaintiff there had sued the PHA and its officer after she had approached the officer about an assault earlier that day, the officer asked the plaintiff to identify and confront her assailant, who was sitting on a park bench, and the plaintiff was attacked during the identification by a small mob that had gathered at the bench.  Id. at *1.  The court found that a jury could find that the plaintiff's injury was foreseeable and that

-21-

there were issues of fact regarding whether the officer had wilfully disregarded her safety by doing nothing to protect the Plaintiff or stop the attack.  Id. at *2.  A reasonable jury could also find that the officer exercised control over the Plaintiff in instructing her to identify the assailant and that there was sufficient evidence that the Officer had made the Plaintiff more vulnerable to danger than should would have been without his intervention.  Id. at *2-3

### b.      Defendants Psota and Dykie

In the present case, taking the facts in the light most favorable to the Plaintiffs, Plaintiffs cannot establish a viable claim under this theory against Officer Psota and Chief Dykie.  First, Plaintiffs have not clearly identified the harm they have suffered; they did not seek any medical attention as a result of the incident and have not alleged any ongoing physical emotional, or economic harm that resulted from the incident.  Plaintiffs do suggest they suffered an "invasion" of their property by their neighbors and were forced to engage in physical altercations with those neighbors, allegedly at the instigation of Officer Calvanese.  However, Plaintiffs have not described how such harm was reasonably foreseeable as a result of the conduct of Defendants Psota and Dykie, who, according to Plaintiff Dale Brown, did not engage in conversations with the neighbors before the violence and who therefore could not possibly be responsible for inciting the violence.  Notably, Plaintiffs do not argue anywhere in their briefs that Psota or Dykie played any role in instigating the neighbor's aggressive behavior.

Furthermore, Plaintiffs have offered no evidence that either defendant Psota or Dykie acted with willful disregard of Plaintiffs' safety.  In contrast to the actions of the Officer in Bumpess, who watched the attack passively, Officer Psota tried to break up the fight between Plaintiffs' son and a neighbor once the fighting began.  Chief Dykie similarly calmed down

Officer Calvanese when he challenged Dale, thus preventing additional injury.

Most importantly, Plaintiffs have not described how Defendants Psota and Dykie exercised sufficient control over the plaintiffs to warrant a reasonable jury finding that the Defendants were essentially responsible for the harm suffered.  Although the Defendants did direct Plaintiffs on what to do and where to stay once the fighting broke out, that exertion of control did not render the Plaintiffs vulnerable to the harm they ultimately suffered; that harm– the invasion and the violence– was actually experienced prior to any exercise of authority. Defendant Psota's mere questioning of Plaintiffs regarding the cannon prior to the violence does not constitute control that gave rise to any duty to protect or that would render him "responsible for" the violence that later occurred when the neighbors arrived.  Unlike the Defendants in both Kneipp and Bumpess, Defendants here did not instruct Plaintiffs to take any action that ultimately led to the harm suffered.

Plaintiffs have not demonstrated how the Officers used their authority to make the Plaintiffs more vulnerable.  In fact, according to Plaintiff's own testimony, they used their authority to resolve an escalating situation.  Thus, no reasonable jury could find on the facts presented that Defendants' conduct violated clearly established law under the state-created danger theory.   As such, Defendants Psota and Dykie are entitled to immunity on that claim.

### c.    Defendant Calvanese

Plaintiffs have raised some issues of fact concerning Defendant Calvanese that create a slightly stronger Fourteenth Amendment Claim under a state-created danger theory. Plaintiffs argue that Officer Calvanese incited the neighbors to attack the Plaintiffs and thus should be held responsible for creating such a dangerous environment.  They provide ample testimony regarding

Calvenese's interactions with the neighbors prior to their arrival at the Plaintiffs' home and once

the fighting began, as well as concerning the "bad blood" between Plaintiffs and Calvanese.

Such testimony allows the allegations of incitement to seem plausible to a reasonable juror and

therefore liability under the state-created danger doctrine more viable.  However, even accepting

Plaintiffs assertions that (1) Officer Calvanese incited the mob, (2) Plaintiffs' injury was

foreseeable from Officer Calvenese's conduct and (3) Officer Calvanese did nothing to mitigate

the harm once the violence began, Plaintiffs cannot establish the relationship element of the

claim, and thus their claim must also fail against Defendant Calvanese.

As with Defendants Psota and Dykie, Plaintiffs never assert that Officer Calvanese ever

exerted any control over them so as to satisfy the relationship requirement.  Notably, the cases

applying the state-created danger doctrine generally arise out of situations where a state actor

owes a due process duty of protection to the Plaintiff, often based on quasi-custodial

relationships.  See Brown v. Grabowski, 922 F.2d 1097, 1115-16 (3d Cir. 1990) (discussing prior

cases developing the state-created danger doctrine).  Officer Calvanese here owed no affirmative

duty to Plaintiffs; other than his short visit regarding the cannon hours earlier, he had no

interaction with the Plaintiffs that day and he exercised no control over their actions.  He had not

taken them into custody, and unlike the Officers in Kneipp and Bumpess, he did not instruct the

Plaintiffs to take any action that led to their injury.   As such, this case is not one where the state-

created danger doctrine imposed a duty to act, and therefore liability, on the state actor.

Furthermore, the Plaintiffs have offered no evidence that Officer Calvanese used his

authority as an officer to create an opportunity for harm that would otherwise have not existed.

Instead of describing how Defendant Calvenese created a uniquely harmful situation and placed

the Plaintiffs in a position of vulnerability using his authority, Dale Brown testified as to several

other reasons for the harm suffered by the neighbors' conduct, namely the cannon Dale shot off

earlier and threats he was accused of making against DeLuzio's son.  While Plaintiffs suggest he

told the neighbors to take certain actions, they offer absolutely no concrete evidence of such

instructions other than their suspicions and the fact that the Defendant and the neighbors arrived

together.  Based on the scant evidence in the record, Plaintiffs have not met their burden of proof

in showing that Calvanese used his position as a state actor to make the Plaintiffs more

vulnerable to harm than they otherwise would have been.

Therefore, even taking the facts in the light most favorable to them and even assuming

Defendant Calvanese played some role in initiating the neighbors' conduct, Plaintiffs have failed

to meet their initial burden of showing that Defendant Calvanese has violated clearly established

law under the state-created danger theory.  They have not presented facts indicating he had a

special relationship with the Plaintiffs or that he used his authority to created an opportunity that

otherwise would not have existed for the third party's crime to occur, and thus the law did not

impose a duty to act, and therefore liability, on Defendant Calvanese, in this situation.  As such,

Defendant Calvanese also deserves qualified immunity on this claim.

### C.   Municipal Liability: <u>Monell</u> Claim

Plaintiffs argue that New Hanover Township should be held liable for the conduct of its

officers, which allegedly amounts to a custom of harassment of Plaintiffs.  A municipality may

not be held liable for the acts of its employees on a theory of <u>respondeat superior</u> or vicarious

liability.  <u>Monell v. Dept. of Social Services of New York City</u>, 436 U.S. 658, 692-693 (1978).  It

is well-settled that to establish a violation of 42 U.S.C. § 1983 by a municipality, a plaintiff must

show that the alleged misconduct was caused by an official government custom or policy, or a "failure to train." Monell, 436 U.S. at 694; City of Canton v. Harris, 489 U.S. 378, 387-88 (1989). Municipal policy or custom can be demonstrated either by reference to express, codified policy or by evidence that a particular practice, although not authorized by law, is so permanent and well-settled that it constitutes law. Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996). Whether alleging policy or custom, the plaintiff must show that a policymaker was responsible for the affirmative proclamation of the policy or acquiesced in the well-settled custom. Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990).

Once the policy or custom is established, a plaintiff must demonstrate causation, as a municipality can be liable under § 1983 only where its policies are "the 'moving force' behind the injury alleged." Berg v. County of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000) (quoting Board of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 404 (1997)). Thus, plaintiffs must show that the "policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to their injury." Bielevicz, 915 F.2d at 851. If the policy or custom does not facially violate federal law, causation can be established only by showing that "the municipal action was taken with 'deliberate indifference' to its known or obvious consequences." Berg, 219 F.3d at 276.

Plaintiffs argue that Defendants had a custom or policy of systematic harassment that began when Plaintiff moved to New Hanover Township eleven years ago, culminating in their injuries during the July 4th 2005 incident. (Memorandum of Law in Support of Pl.'s Response to Def.'s Motion for Summary Judgment Pg. 11). Specifically, Plaintiffs contend Defendants harassed Plaintiffs regarding their dog, refused to investigate crimes against Plaintiffs and their

property, harassed Plaintiffs in public, threatened Plaintiff Dale Brown, incited the mob during

the July 4th 2005 incident, and refused to protect Plaintiffs during the July 4th 2005 incident.

Plaintiffs argue that Chief Dykie has allowed and participated in such harassment by his officers.

(Id.).

      The Court initially notes that Plaintiffs have not clearly described the constitutional

deprivations or other concrete injury suffered as a result of the municipality's custom or policy.

As described above, Plaintiffs have not established a violation of their First, Fourth, or

Fourteenth Amendment rights arising from the events on the evening of July 4th, 2005, or

thereafter.  Based on their complaint, it is unclear what specific injury Plaintiffs claim to have

suffered as a result of the alleged systematic harassment.  However, even assuming such an

injury did occur, Plaintiffs have failed to sufficiently demonstrate on the record the existence of a

policy or custom of harassment.

      Plaintiffs have not argued that an official express or codified policy existed, but rather

than an implicit custom or practice of perpetual harassment of Plaintiffs was pervasive

throughout the department.  Still, based on the facts presented, Plaintiffs have not established that

harassment of the Plaintiffs was "so permanent and well-settled that it constitut[ed] law."  Beck,

89 F.3d at 971.  Plaintiffs must at least offer some evidence that the alleged harassment

constituted more than a few isolated incidents by one or two inferior officers.  See Mariani v.

City of Pittsburgh, 624 F. Supp. 506, 511 (W.D. Pa. 1986) (noting that isolated events will not

establish a pattern of abusive behavior for municipal liability).  Rather that simply reciting a

number of complaints or offenses, a Plaintiff must show why those prior incidents deserved

discipline and how the misconduct in those situations was similar to the present one.  Id.  See

-27-

also <u>Voutour v. Vitale</u> 761 F.2d 812, 820 (1st Cir. 1985) ("Even if we were to credit complaints of police brutality as well as complaints of other shootings, we cannot see that they form a pattern of police violence so striking as to allow an inference of supervision, encouragement, condonation, or even acquiescence.").

Plaintiffs have failed to meet this burden.  They have provided no evidence regarding complaints made by Plaintiffs to the Township prior to the July 4th incident or any failure to address the police conduct prior to that incident.  Thus there is no evidence implicating policymaking officials or imputing their acquiescence to the alleged harassment.  There is likewise no evidence of similar treatment of other individuals or other complaints lodged against the officers to demonstrate any consistent pattern of harassment.  Furthermore, Plaintiffs have not presented testimony from any additional witnesses verifying the alleged harassment of the Plaintiffs in public, and there is no testimony regarding harassment by any officers, other than the few incidents with Defendant Calvanese, prior to the July 4th, 2005.  Notably, one of the few incidents Plaintiffs list as comprising the harassment– the problems with Plaintiffs' dog– Plaintiffs specifically admit the police handled appropriately; such an admission indicates the incident should not be considered as part of the alleged harassment.  (Dale Brown Dep. Pgs. 108- 112).  Thus, Plaintiffs offer only a few specific interactions with Officer Calvanese, with whom Plaintiffs shared a mutual personal dislike, and the final July 4th, 2005 altercation as evidence of the custom of harassment within the department.  Importantly, Officer Calvanese was disciplined as a result of his threatening behavior towards Dale Brown during the July 4th, 2005 incident, yet another indication that it is not a policy of the municipality to allow its officers to harass the Plaintiffs.

This evidence clearly does not establish a pattern "so striking" as to allow for the inference of supervision that is required to establish custom. Voutour, 761 F.2d at 820; Bielevicz 915 F.3d at 850. Conclusory allegations, such as the ones here, without factual evidence to support them, cannot satisfy the Plaintiffs' burden to prove that a custom existed in order to avoid summary judgment.[3] See Williams v. Lane, 2007 WL 756731, *4 (E.D. Pa. March 8, 2007) (granting summary judgment for defendants was appropriate where the record was insufficient to determine that a policy or practice existed and such a determination would require too many inferential leaps). No reasonable jury could conclude from the evidence presented here that an official policy or custom– a practice so well-settled as to constitute law– of harassing the Plaintiffs existed within the department. Therefore, summary judgment in favor of Defendants is granted on this claim.

### D.      Supervisor Liability of Chief Dykie

Plaintiffs also argue that Chief Dykie should be held liable as a supervisor of Defendants Calvanese, Psota, and the unnamed Defendants. As with municipal liability, supervisors cannot be held liable under a theory of respondeat superior. City of Canton, 489 U.S. at 385. However, a supervisor may be held liable personally under § 1983 if he participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's violation. A.M. ex rel. J.M.K. v. Luzerne County Juvenile Detention Center, 372 F.3d 572 , 586 (3d Cir. 2004). Alternatively, if plaintiffs can show that a

---

[3]Plaintiffs continually mention their attempts to take Depositions of Defendants and cite to their Memorandum in support of their Motion to Compel, which outlines their reasons for failing to notice any depositions during the discovery period. This Court denied the Motion and thus will not consider any of Plaintiffs' arguments in support of their Motion to Compel as justification for failing to adequately provide evidence on their Motion for Summary Judgment.

supervisor acted with deliberate indifference in establishing and maintaining a policy or custom that directly causes the plaintiff's harm, the defendant can be held liable under §1983.  Id.

As with the Monell claim, Plaintiffs claim under this theory must also fail for lack of evidentiary support in the record.  Plaintiffs argue that "Defendants fail to carry their burden in showing that Chief Dykie was not involved in violating Plaintiffs' rights, directing others to, or acknowledging or acquiescing to them."  (Memorandum of Law in Support of Pl.'s Response to Def.'s Motion for Summary Judgment Pg. 12).  Instead, Plaintiffs argue, Defendant Dykie "moved to increase the harassment."  However, Plaintiffs have incorrectly placed the burden on Defendants here: Defendants do not need to show that the Chief was not involved in the violations; rather, the Plaintiff must show that the chief was involved in the violations, had some knowledge of the violations, or otherwise acted with deliberate indifference in establishing a custom or policy that led to the Plaintiffs' injuries.

Again, Plaintiffs have failed to present any facts to sustain such conclusions.  As described above, there is no evidence of a policy or custom acquiesced to or established by Chief Dykie.  Furthermore, Plaintiffs have presented no facts indicating that Chief Dykie caused any of the other officers' allegedly harassing conduct; there are no depositions of Chief Dykie or any other officers to support such conclusions.  Other than Plaintiffs' assertions that Chief Dykie did not respond to their complaints as aggressively as they would have liked and perhaps treated them with disrespect, Plaintiffs offer no evidence that he participated in any sort of pervasive "harassment" that rises to the level of custom.  Furthermore, because Plaintiffs offer no evidence of complaints lodged prior to the July 4th, 2005 incident, there is no indication that Chief Dykie knew or should have known of the allegedly harassing conduct of his inferior Officers.  In fact,

rather than acting with indifference, after Chief Dykie witnessed Officer Calvanese act inappropriately towards Dale Brown by threatening him, Chief Dykie stopped Officer Calvanese's behavior and later had him disciplined.  Under these circumstances, no reasonable jury could conclude that Chief Dykie is liable under a supervisory theory for the conduct of his officers.  Thus, summary judgment should be granted on this claim in favor of Defendants.

### E.      State Law Claims

Plaintiffs have also brought several state law claims under Count II of their complaint. This Court initially retained jurisdiction over these claims pursuant to supplemental jurisdiction under 28 U.S.C. § 1367.  However, as this Court has granted summary judgment in favor of the Defendants on all federal claims, the Court can now exercise its discretion and dismiss the remaining state law claims.  See United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").   Furthermore, this is not such a case where the allowable scope of the state claim will possibly implicate other areas of federal law so as to warrant retaining jurisdiction over the state law claims.  See id.  Rather, the claims involved in Count II concern only state tort law, namely assault and battery, conspiracy, and aiding and abetting.  The Court will thus decline to exercise supplemental jurisdiction and the will dismiss the state law claims without prejudice.  _____

**IV.     Conclusion**

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted on all

federal claims.[4]

An appropriate Order follows:

O:\Lauren\Brown v. New Hanover\outline msj.wpd

---

[4]As this Memorandum was being completed, the Third Circuit published its opinion in
<u>Walter v. Pike County</u>, _____ F.3d _____ Nos. 06-5034, 06-5144, 07-1688, (3d. Cir. Sept. 18,
2008).  That decision reaffirms the principles regarding qualified immunity and the state-created
danger doctrine discussed within this Memorandum and supports the conclusions herein.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DALE BROWN & | : | |
| ROXANNE BROWN, individually | : | CIVIL ACTION |
| and as H/W | : | |
| v. | : | |
| | : | |
| NEW HANOVER TOWNSHIP | : | NO. 07-2776 |
| POLICE DEPARTMENT, NEW | : | |
| HANOVER TOWNSHIP, MICHAEL | : | |
| DYKIE, ANTHONY CALVANESE, | : | |
| DENNIS PSOTA, and JOHN DOES 1-10 | : | |

## ORDER

For the reasons stated in the foregoing Memorandum:

1.    Plaintiffs' Cross Motion for Partial Summary Judgment (doc. no. 29) is **DENIED.**

2.    Defendants' Motion for Summary Judgment (doc. no. 16) on all federal claims is

**GRANTED**.

3.    Plaintiffs' claims, under state law, are dismissed without prejudice.

4.    Final judgment is entered in **FAVOR** of defendants and **AGAINST** plaintiffs.

5.    The Clerk is **ORDERED** to close this case.


BY THE COURT:

/s/ Michael M. Baylson

Date:    9/19/08

_____
Michael M. Baylson, U.S.D.J.

-33-